## HARRY A. THURSTON *vs.* MARY A. NUTTER.

### Penobscot.   Opinion September 24, 1926.

*A contract partly in writing and partly oral is a parol contract, and a parol contract to support one during life is not within the statute of frauds.*

*He, who contracts to support another during life and then commits a breach of the contract that is wilful, purposeful or in bad faith, cannot recover in an action on a quantum meruit, for services rendered or benefits conferred.*

*If such a contract is not completed by a meeting of the minds of the parties, an action will lie to recover reasonable compensation for beneficial services rendered not gratuitously if the other party knows it and permits it and accepts the benefit, as there is a presumption that the services were requested with an intention to pay for them and the law implies a promise to pay.*

In the instant case whether or not a contract was made between the parties and, if so, its terms were questions of fact for the jury, and the jury by their verdict must have found that an agreement was made as claimed by the defendant and, that the plaintiff wilfully abandoned and broke it.

Upon a careful examination of the facts we are of the opinion that the conclusions of the jury were not authorized by the proof and that the only authorized conclusion is that the minds of the parties did not meet and the contract was not completed.

On motion for a new trial by plaintiff.   An action of assumpsit for services rendered to and expenditures made for defendant.   Plaintiff claimed the defendant orally agreed that if he would move upon her farm and care for and support her during life, she would give him a deed of the farm and take from him a bond for support secured by a mortgage on the farm; that he moved to the farm and carried it on for a year and repaired the buildings, and that defendant refused to give the deed and he left the farm.   Defendant admitted that there was an agreement to support her but no agreement for giving a deed and mortgage and that plaintiff wilfully abandoned the contract. Verdict for defendant and general motion for new trial filed.   Motion sustained.   New trial granted.

The case fully appears in the opinion.

*L. B. Waldron*, for plaintiff.

*W. B. Peirce*, for defendant.

SITTING: WILSON, C. J., PHILBROOK, DEASY, BARNES, BASSETT, JJ. MORRILL, A. R. J.

BASSETT, J.   Action of assumpsit to recover for services rendered to and expenditures made for the defendant.   Writ dated September 19, 1923.   Declaration contained three counts.

The first was a special count setting out an oral agreement that, if the plaintiff would move upon the farm of the defendant and care for and support her during life, she would give him a deed of the farm and take from him a bond for support secured by a mortgage on the farm; that the plaintiff moved to the farm and for a year, until July 1923, performed on his part, during that time working himself, hiring labor, furnishing supplies for the house and the farm stock and materials for repairing the buildings, all to the amount of $968; and that the defendant refused to perform.

The second count was upon account annexed of the items making up the above total.   The third count was for money had and received.

Plea, general issue.   Verdict for defendant.   Case comes up on general motion.

The defendant, a widow seventy-five years of age, whose husband had died the year before, owned a small farm near the village of Dexter with a small amount of stock.   She became acquainted with the plaintiff, who was in charge of a store in the village, and his wife and early in the Summer of 1922 suggested that they come to the farm and take care of her while she lived, as the plaintiff testified, "for what there was."   The plaintiff and his wife had subsequent conversations with her, went to the farm to see her and in October moved on to the farm, taking farm stock, consisting of some cows, a horse, hogs and poultry.   Before going the plaintiff cut and housed the hay.   He continued at the store until the following February but during the Fall and Winter worked, as he could, on the farm and buildings.   He also hired his brother to work on the farm during this period.   The house was cleaned, a new kitchen built, papering and painting done, house and yard for poultry built and considerable carpenter work done and materials used in repairing and improving the house and barn.   The following Spring the plaintiff put in the usual farm crops.   According to the account the labor of plaintiff and his wife amounted to $117, he had paid for labor to the amount of $202, furnished wood, coal, hay and grain to the amount of $125,

and paid for the materials $341. The defendant was charged with board for the time plaintiff was on the farm $164. What the plaintiff did he did of his own volition neither asking the defendant nor being requested by her. He testified it was done for his convenience as well as hers. He and his wife treated the defendant kindly, gave her good board and care and the relations were harmonious until the last of the following June.

Prior to the plaintiff's coming to the farm the defendant wrote down on a piece of brown paper some terms for agreement, as she testified "as it come to me." She read this to the plaintiff's wife the first time she came to the farm and talked it over with her. Later she read it to the plaintiff and his wife before they moved. The plaintiff testified "she had a contract drawed up" and "that contract was that we was to come there, take care of her, have her real estate and personal property, have what wood was to be used on the place but none to sell and we was to give her a good burial but not an expensive one— We was to have the real estate and personal property for taking care of her." The plaintiff's wife and defendant testified to the same effect. This memorandum was not signed but these terms were agreed to by both parties.

The plaintiff and his wife both testified there was a further part of the agreement. His testimony was as follows:

Q. "There was nothing said about her giving you a deed of it at that time?

A. "She was to draw up papers to show that we had something to show for it.

Q. "That was what she was going to give you was a writing?

A. "Yes, sir.

Q. "That you was to have the place after she was dead?

A. "Yes, sir."

The testimony of the wife was:

Q. "What was the agreement in regard to the writing?

A. "And she was to give us a writing after we got settled there, she was to draw up a paper or draw up writings so that any one that came up—anything that came up afterwards, that they could not take it from us afterwards.

Q. "She was to give you security?

A. "Yes, sir, she was to give us security so that we would have the place after she had gone.

Q. "Later on after you got there what conversation, if any, did you have with her in regard to giving the security?

A. "I asked her two or three times, we got to speaking about it, and I said we would have to have some writings done before long because something might come up that we might not have any at all—she might be taken sick and die and we would have nothing to show that we was to have the place, after we had done the work we had done there.

Q. "Did she make any reply to that?

A. "She did not say anything at all."

The plaintiff testified that he did not speak of the agreement to the defendant or ask her "for a writing" until the last of the following June and the defendant testified she did not speak to him.

The defendant testified,

Q. "Was there anything more said about the agreement?

A. "After they got there Mrs. Thurston stated to me that Harry wanted to wait a year, try it a year. I was satisfied with that; furthermore there was nothing said about the agreement."

In reply to another question about this incident her answer was:

"It was after they moved there, soon after they moved she made that statement to me, that Harry wanted to try it for a year and I was agreeable for I thought it would give us both a chance to try it, so there was nothing more said and I thought no more about signing the paper until the year was up.

Q. "You did not have any conversation with Mr. Thurston about that?

A. "No.

Q. "In no way at no time?

A. "There was no more said about the paper at all until he demanded what I considered a deed the 29th day of June."

Mrs. Thurston denied that she made the suggestion and said that it came from the plaintiff.

As to the paper she had written, the defendant testified "I considered the paper they were to sign was an agreement of recompense to them; that it bound me and them both." And "I was going to write the copies in ink for each of us to have when they got ready to sign it." In reply to the question "did you expect him to come there without some security and take care of you during your life?" she said, "I expected him when he was satisfied with the paper to sign the paper and then we would be all right."

In the following June the defendant, it would appear of her own volition, spoke to a Mrs. Morrill, who was working for Mrs. Thurston, about the paper. Although Mrs. Morrill in her direct testimony stated that the defendant said she would not sign any paper, on cross-examination she made it clear that the defendant said she would not sign any deed, that she thought the Thurstons expected it but would be disappointed as she did not believe in people signing away their property.

This conversation was overheard by Mrs. Thurston, who reported it to her husband and on the same evening they had a talk with the defendant and the plaintiff asked as she testified, "for papers that I considered a deed and therefore I refused because I had this other paper for him to sign that would bind us both, me to care for him and him to care for me and he to have my property when I was through with it, what I left."

The plaintiff and his wife at first testified that she refused to sign any paper but from their whole testimony it is clear that she refused to give any deed.

The plaintiff and his wife refused to stay longer, and shortly after left the farm.

The theory of the defendant was that the agreement which the plaintiff and defendant made was that contained in the memorandum; that this was read to him and assented to by him and he entered upon its performance and then requested a deed which was not mentioned in the memorandum and because it was not given refused to perform and abandoned the contract.

Such a contract although a parol contract, because in part in writing and in part verbal, *Farwell* v. *Tillson*, 76 Maine, 237, *Miller* v. *Sharp*, 100 N. E., 108 (Ind.), would not be within the statute of frauds. A parol contract to support one during life is not within the statute, *Hutchinson* v. *Hutchinson*, 46 Maine, 154.

The decisions upon the specific question of the right of one who breaks a contract to support another for life to recover on a quantum meruit are not many and there is a conflict.

In *Ptacek* v. *Pisa*, 83 N. E., 221 (Ill.), and *Lathrop* v. *Moyer*, 86 Mo. App., 355, it is held that an action on a quantum meruit will not lie where there is a repudiation or wilful failure to perform.

But in *Pitts* v. *Pitts*, 21 Ind., 309, and *Vancleave* v. *Clark*, 20 N. E., 527 (Ind.), and *Sullivan* v. *Sullivan*, 92 S. W., 966, (Ky.), it is held

that such an action may be maintained for the fair and reasonable value of the services rendered and benefits conferred.

Before this court there has been one case where a son agreed with his father to carry on the homestead farm, divide the proceeds and receive the farm after the father's death. The son faithfully performed up to an illness, that incapacitated him from work, and, but for the illness, would have continued to perform. It was held that an action on a quantum meruit was maintainable, although the case went off on a nonsuit. "Recovery may be had for the value of the service actually rendered where the performance of an entire contract is prevented by sickness or death. A circumstance that has had a decisive influence is the fact that in such case the other party has received and retains the benefit of the services." *Preble* v. *Preble*, 115 Maine, 26.

There is a similar conflict of authority in the analogous cases of contracts for work and labor and personal services. *Lynn* v. *Seby*, 151 N. W., 31, (No. Dak., 1915) where there was a refusal to complete a contract for services partly performed, summarizes in a valuable way the conflicting decisions.

"The rule at common law was against the plaintiff's recovery until the case of *Britton* v. *Turner*, 6 N. H., 481; 26 Am. Dec. 713, was decided in 1834 in disregard of precedent. But the reasoning of that case is so cogent that it seems to have divided, if not changed, the current of authority. It first recognized the fact of the benefits of the part performance to the party who would keep such benefits, incapable of being returned, and still avoid paying anything for the benefits accrued, where the contract is not fully performed . . . . An equitable rule has gradually developed permitting a recovery for the value of the services rendered, irrespective of the breach, giving to the other party to the contract a corresponding right of action in damages separately or in mitigation of the plaintiff's recovery so that the rights of both may be equitably adjusted at law notwithstanding the breach and non-performance of the contract. (Cases cited). This is true only where that which has been received by the employer under the partial performance has been beneficial to him. . . . . While there is a division of authority and the weight of authority from the number of holdings alone would deny a right of recovery, yet we prefer to follow the other line of authority. Either rule must,

under certain circumstances work injustice.    Otherwise there would
be no division in authorities.    We elect to follow that which we
believe to be the trend of authority."

And the case held a promise would be implied, from the work and
labor beneficial to the other party to pay its reasonable value.

There has been much discussion whether an obligation arises from
the retention of benefits rendered, under a doctrine of "unjust
enrichment" so called, and an ensuing obligation quasi ex contractu,
and this distinction has been suggested for cases of wilful breach.
"In cases of this kind the courts have not noticed any distinction
between contracts where the broken condition is express and where it
is simply implied; and yet it would seem that such a distinction might
well be made.    Where an express condition is introduced into a
contract of this kind, it is put in for the express purpose of guarding
against a wilful breach, such must be the intention of the parties in
nearly all cases; therefore to allow a recovery in quasi contract would
be, under such conditions quite useless; in short there are no equitable
grounds on which plaintiff can claim relief.    In the case of an implied
condition, however, there is a difference.    An implied condition is,
strictly, nothing more than an equitable excuse for not having per-
formed; the whole question therefore is equitable and is reduced to
determining whether, even in the case of wilful breach, it is just that
plaintiff should not be allowed to recover for benefits conferred on
the defendants, and it is submitted that it is not just and that in
such cases recovery should be allowed."    8 Harvard Law Review,
364; 10 Ibid, 381; 12 Ibid, 284.

The "cogent reasoning" of *Britton* v. *Turner* was not followed by
this court.    In *Miller* v. *Goddard*, 34 Maine, 102 (1852) the New
Hampshire doctrine was argued by counsel, considered by the court
and not adopted.    "When the laborer has adequate cause to justify
an omission to fulfil the contract he cannot be regarded as in any
fault.    But it does not very well accord with the good faith which the
rules of law uniformly require, to allow him to stop at any stage of his
labor in open violation of his agreement, and still compel his employer
to pay him what his services are worth.    If it were permitted to the
laborer to determine the contract at his pleasure, no well founded
reliance could be placed at any time upon a due observance of it."
It was accordingly held that if the laborer voluntarily quits the service
before the expiration of the time without justifiable cause he can
recover nothing for his previous labor.

There is too a consideration of public policy for if "irrespective of the breach," *Lynn* v. *Seby*, supra, recovery were allowed on a quantum meruit there would be an increasing tendency to break existing contracts.

This court has always while considering the matter of retention of benefits considered the nature of the breach.   It has recognized well defined classes of cases where there has been an endeavor in good faith to perform, substantial performance and, although some variance, with the work and material of value and benefit to the other party.   *Hattin* v. *Chase*, 88 Maine, 237; *Skowhegan Water Company* v. *Skowhegan Village Corporation*, 102 Maine, 323.

But where the breach is wilful, purposeful or in bad faith no recovery on a quantum meruit is permitted.   *Miller* v. *Goddard*, supra; *Veazie* v. *Bangor*, 51 Maine, 509; *Holden Steam Mill* v. *Westervelt*, 67 Maine, 446; *Dixon* v. *Fridette*, 81 Maine, 122.

Therefore the plaintiff's leaving the farm under the defendant's theory of the case would have been a breach, which would have prevented the maintenance of an action on a quantum meruit, if the defendant's theory of the case were correct.

The theory of the plaintiff, on the other hand, was that the agreement also included an agreement for making out papers which would secure him in his performance, and that a part of such papers included a deed.   If that were the agreement and the defendant refused to give the deed, the plaintiff would have the legal right to elect to rescind and sue on a quantum meruit, *Dixon* v. *Fridette*, supra.

But if the agreement, instead of being as contended by the plaintiff or by the defendant, was not completed because there was not a clear accession on both sides to one and the same set of terms, *Wiswell* v. *Bresnahan*, 84 Maine, 398, or a complete mutuality of engagement so that each had the right at once to hold the other to a positive agreement, *Preble* v. *Hunt*, 85 Maine, 267, then the plaintiff could maintain an action on a quantum meruit because where one party renders services beneficial to another under circumstances that negative the idea that the services were gratuitous and the party, to whom the services are rendered, knows it and permits it and accepts the benefit, he is bound to pay a reasonable compensation therefor. That is because such facts and circumstances justify a presumption that the party to whom the services are rendered must have requested them and must have intended to pay for them and therefore the law

implies a promise on his part to pay for them.    *Wadleigh* v. *Pulp and Paper Company*, 116 Maine, 113.    We think the circumstances here satisfy the rule, if the minds of the parties did not meet.    The amount of benefit to the defendant would be a question of fact for the determination of the jury.

In the absence of any exceptions to the charge of the presiding justice or requests for instructions it is to be assumed that full and adequate instructions were given to the jury upon the principles of law applicable to the case and to enable them to understand the issues and to appreciate the kind and degree of proof to establish them.

Whether or not a contract was made between the parties and, if so, what were its terms were questions of fact for the jury.    The jury by their verdict for defendant must have found that the agreement which was made was as claimed by the defendant and that the plaintiff wilfully abandoned and broke it.

This is a motion for a new trial on the ground that the verdict is against the evidence and the weight of evidence.    The evidence was in some respects contradictory though the most substantial facts seem to have been perfectly established.    "A court of law is not in the habit of setting aside verdicts on such ground except in those cases where it is plain that the jury have drawn conclusions unauthorized by the proof.    Whether they have done so in any particular case is often a question of difficulty and one which should be examined with care and decided with caution."    *Palmer* v. *Barker*, 11 Maine, 338.

Upon a careful examination of the facts we are of the opinion that the conclusions of the jury were not authorized by the proof and that the only authorized conclusion is that the minds of the parties did not meet and no completed contract was made.    This conclusion harmonizes the facts in the case.    While the parties were agreed upon the terms contained in the memorandum, the memorandum was not the complete contract.    The parties further agreed it should be put into a written form to insure its performance but what that form was to be was not agreed.    The conduct and testimony of the defendant clearly establishes this.    Whether the suggestion as to waiting a year was made by her or Mrs. Thurston she testified that she stated to Mrs. Thurston she was satisfied "to wait a year, try it a year."    Her conversation with Mrs. Morrill shows that she had some reason to believe that the plaintiff wanted a deed which she did not propose

to give.   She was awaiting when he would be satisfied with a signed copy of the memorandum which she believed to be binding on both. "I expected him *when he was satisfied* with that paper to sign the paper and *then* we would be all right."   Her conduct and admissions clearly show that on this part of the agreement no positive agreement to which "each had the right at once to hold the other" had been reached by the parties.

We therefore conclude that the verdict is so clearly wrong that it must be set aside.

*Motion sustained.*
*New trial granted.*